UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

REBECCA DELANE MCINTYRE,
    *Plaintiff,*

v.                         CASE NO: _____

DELRAY MEDICAL CENTER, INC.,
RIC L. BRADSHAW, as Sheriff of
Palm Beach County, Florida,
ERIK RITACCO, Deputy of Palm Beach
County Sheriff's Office,
DEPUTY MCCABE, Palm Beach County
Sheriff's Office,
DEPUTY TAYLOR, Palm Beach County
Sheriff's Office,
JOHN DOE DEPUTY 1, Palm Beach
County Sheriff's Office, and
JOHN DOE DEPUTY 2, Palm Beach
County Sheriff's Office,
    *Defendants.*

FILE_ _Y _ICS_ D.C.

JUL 22 2026

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. – W.P.B.

# COMPLAINT FOR FEDERAL CIVIL RIGHTS VIOLATIONS (42 U.S.C. §§ 1983, 1985, 1986), CIVIL RICO (18 U.S.C. §§ 1962(c), 1962(d)), FLORIDA BAKER ACT VIOLATIONS, AND STATE TORT CLAIMS, AND DEMAND FOR JURY TRIAL

## I. JURISDICTION AND VENUE

1. This Court has federal question jurisdiction under **28 U.S.C. § 1331** because this action arises under the **First, Fourth, and Fourteenth Amendments** to the United States Constitution; **42 U.S.C. §§ 1983, 1985, and 1986**; and **18 U.S.C. §§ 1962(c) and 1962(d)** (Civil RICO).

2. This Court has civil-rights jurisdiction under **28 U.S.C. § 1343(a)(3)–(4)** for claims seeking redress for the deprivation of constitutional rights under color of state law.

1

**3.** This Court has supplemental jurisdiction under **28 U.S.C. § 1367(a)** over Plaintiff's related **Florida statutory claims**, including violations of the **Florida Mental Health Act (Baker Act)**, and **Florida tort claims**, because they arise from the same nucleus of operative facts as the federal claims.

**4.** Venue is proper in the **West Palm Beach Division of the Southern District of Florida** under **28 U.S.C. § 1391(b)(2)** because a substantial part of the events, injuries, unlawful detentions, home intrusions, and omissions giving rise to this action occurred in **Palm Beach County, Florida**.

## II. THE PARTIES

**1. Plaintiff, REBECCA DELANE MCINTYRE**, is an individual of sound mind, and is a citizen of the United States residing in Palm Beach County, Florida.

**2. Defendant, DELRAY MEDICAL CENTER, INC.**, is a private Florida corporation operating a hospital facility located at 5352 Linton Blvd, Delray Beach, Florida 33484. Defendant is sued for **independent** violations of Plaintiff's constitutional rights under color of law, and for acting under color of law in a joint venture and telephonic conspiracy with PBSO deputies and with extraterritorial Kentucky state and private actors acting under color of law. This includes actions for **tortious interference with fiduciary duties** and familial association.

**3. Defendant, RIC L. BRADSHAW**, is the duly elected Sheriff of Palm Beach County, Florida. Sheriff Bradshaw is sued in his official capacity as the chief administrator of the Palm Beach County Sheriff's Office (PBSO). He is legally responsible for the policies, custom, training, and **independent** constitutional violations committed by his deputies, who operated under color of law in a joint venture and telephonic conspiracy with Delray Medical Center and with extraterritorial Kentucky state and private actors acting under color of law. This includes actions for **tortious interference with fiduciary duties** and familial association.

**4. Defendant, ERIK RITACCO** (ID: 26732), was at all times relevant a Deputy Sheriff employed by PBSO. He is sued in both his individual and official capacities for committing **independent** constitutional violations under color of law, and for operating under color of law in a joint venture and conspiracy with extraterritorial Kentucky state and private actors utilized through **at least telephonic communications**. This includes actions for **tortious interference with fiduciary duties** and familial association.

**5. Defendant, DEPUTY MCCABE**, was at all times relevant a Deputy Sheriff employed by PBSO. He is sued in both his individual and official capacities for committing **independent** constitutional violations under color of law, and for operating under color of law in a joint venture and conspiracy with extraterritorial Kentucky state and

2

private actors utilized through **at least telephonic communications**. This includes actions for **tortious interference with fiduciary duties** and familial association.

6. **Defendant, DEPUTY TAYLOR**, was at all times relevant a Deputy Sheriff employed by PBSO. She is sued in both her individual and official capacities for committing **independent** constitutional violations under color of law.

7. **Defendant, JOHN DOE DEPUTY 1**, was at all times relevant an unidentified Deputy Sheriff employed by PBSO. He is sued in both his individual and official capacities for committing **independent** constitutional violations under color of law.

8. **Defendant, JOHN DOE DEPUTY 2**, was at all times relevant an unidentified Deputy Sheriff employed by PBSO. He is sued in both his individual and official capacities for committing **independent** constitutional violations under color of law.

# III. STATEMENT OF FACTS

1. On July 17, 2022, Plaintiff placed a call to 911 to confirm that her phone could reach EMS. At the time of the call, Plaintiff was experiencing persistent intermittent phone issues, including inability to order food and supplies and inability to make or receive standard phone calls and texts, and did not know whether the device could successfully connect.

2. After the dispatcher answered, Plaintiff described the intermittent phone failures and the effects of the disruption, including difficulty obtaining basic necessities such as food. Plaintiff stated that she needed to determine that she could effectuate a call and apologized to the dispatcher. She stated that her brothers had brought about a fraudulent guardianship in Kentucky and that she was afraid she could be accused of failing to render aid in the event of an emergency involving her mother. To ascertain where in the house Plaintiff could best communicate, Plaintiff and the dispatcher moved through different areas while testing the connection, with Plaintiff asking variations of "Can you hear me now?" and the dispatcher responding with phrases such as "I can't hear you," "I hear you now," or similar acknowledgments, until the call dropped. The call duration was approximately six minutes. (15:01 to 15:07) Plaintiff is of the belief that dispatch called back at least once when call was dropped again, though her phone records do not show this.)

3. According to the police report, (15:11) dispatch assigned Signal Code 84 and Non Crime Code OT, and entered "help with mother" in the system as a non emergency. Dispatch did not dispatch Emergency Medical Services or paramedics to the residence. At no time in Plaintiff's interaction with Dispatch was she informed that if the call dropped it could result in officers being sent out. Plaintiff never would have tried to confirm service had she known this was even a remote possibility. Instead she would have obtained an alternative phone. Plaintiff had not communicated an emergency and had no idea that a dropped call would automatically trigger a response. At her former residence in Kentucky

3

during the period of 2019 to 2021, Plaintiff's prior 911 calls for assistance with her mother had always involved several minutes of direct dialogue with dispatch, often focused on whether Plaintiff could resolve the issue herself, usually when she was unable to get her mother up off the ground. Only after this dialogue, and only at Plaintiff's request, would EMS be dispatched, and there had never been any police involvement.

4. Because her cellular phone service had completely failed to maintain a stable connection with 911, Plaintiff, who had just dismissed the caregiver, made sure her mother was sound asleep in the front room of the residence. Plaintiff stepped out into the backyard and walked to her fenceline to ensure the best possibility of service and called her and her mother's friend, Calvin Haycraft, explicitly requesting that he use Instacart to deliver a TracFone to the residence so Plaintiff could establish reliable emergency phone capabilities. (15:11)

5. While Plaintiff was on the phone with her friend at the backyard fence line, looking out over the fence, she heard a loud rumbling noise at approximately 15:24. She turned around and, to her surprise, saw two officers dressed in navy blue or dark uniforms; these were Deputy Taylor and Deputy McCabe. They said nothing. Plaintiff did not move from her spot for fear of losing phone service and put the phone on speaker to have a witness to the event. Plaintiff had said nothing to the officers and waved them away. Deputy McCabe attempted to break open her gate by giving a swift, forceful jerk on the lock while staring at Plaintiff, then turned his back and followed behind Deputy Taylor.

6. Plaintiff went back inside the house which caused the call to drop with Mr. Haycraft (approximately 15:25). Plaintiff went to the front bedroom and checked on her mother, who was still sound asleep. From her mother's window, sight was impaired because their car was parked in front of the window; however, Plaintiff could determine that no one was on the front stoop at the doors to her home. (15:26 to 15:30) She waited to see if officers would knock as she sat beside her mother's bed and searched through her phone for the attorney who had attended the ambush guardianship hearing in Kentucky on July 11.

7. Having received no knock at the door by officers, having assured her mother was still asleep, she walked to the backyard fenceline and contacted the attorney to try to understand why there had been two officers in dark colored uniforms at her back gate—was it because her call to check for phone service had inadvertently triggered notice of an order to retrieve her mother. She did not understand why officers would even come from a 911 call when even if it could have been misconstrued, it was regarding ensuring medical service couldbe provided should the need arise. Plaintiff was unable to obtain any information regarding a potential warant or court order (the had been dismissd from the case on July 11.)whether an order had been issued to pick up her mother. This call was from 15:31 to 15:36.

8. Plaintiff then returned the previously uninterrupted phone call to Calvin to update him on what had happened and to have him complete the order of the phone as well as groceries and supplies for the animals. (15:36 to 15:47)

9. Plaintiff came in from the backyard, and having not heard back from the attorney, was still in fear of a potential warrant to pick up Elaine. She went to her mother's room a approximatel 15:47 began singing to her and stroking her forehead to get her to wake-up. She bathed her and had just put on a new brief and was getting ready to dress her when there was a knock at the front door. She peeked through the shades, saw officers standing

4

on the front stoop, and sent Calvin an SOS text at 16:05. Plaintiff covered her mother's body, who was naked but for the brief with a quilt and asked her mother could sheGo answer the door and her mother said yes. She told her mother she'd be right back, just close your eyes and rest for a second—her mother said ok and closed her eyes.

10. Plaintiff opened the left side of the front French doors, with the door swinging outward, and as she did so an officer stepped into the space, effectively forcing Plaintiff to surrender control of the door. She was confronted by officers in two different colored uniforms. She asked, "Who are you, and how can I help you?" The officers responded that they were the police. Seeing the different uniforms, Plaintiff then said, "I understand, but what agencies?" The officers answered, "The police — you called 911." At that moment, Calvin called her back (16:06); she picked up, placed him on speaker phone, and said, "Can you hear this?" He confirmed that he could.

11. Suddenly, Officer McCabe placed his hand on the interior side of the closed and locked right French door, meaning his hand was inside Plaintiff's home. He then leaned forward and poked his head around the doorframe and into the home, saying, "Remember me." Plaintiff recognized him as the person who, approximately 40 minutes earlier, had attempted to break her backyard gate lock.

12. Plaintiff now had officers in two different colored uniforms at the doorway, with one maintaining his hand on the interior side of the closed and locked right French door. Plaintiff explained that she had only called 911 to confirm service because she had been having issues with her phone. The officers instructed her that standing beside the door was likely where the alarm system was located and that this would be the best place for her to obtain service. She stepped to the side, and Officer McCabe again stuck his head inside, presumably to verify she was moving toward the alarm. Plaintiff said, "Okay, thank you," and stepped toward the opened left side of the door to close it and end the encounter. However, the officers had possession of that side of the door and, rather than stepping back to allow Plaintiff to close it, remained positioned in front of it, preventing Plaintiff from closing the door and ending the encounter.

13. Officer McCabe, still in the same position with his hand on the interior side of the right French door, again poked his head into the home and said, "Rebecca, let us come in and check on your mother." Simultaneously, two of the three officers each placed a foot across the threshold into the home. Plaintiff replied, "I never said I was Rebecca or that that was my mother. No — you cannot come in, please leave."

14. The officers aggressively pushed across the threshold three separate, distinct times. On each of those three occasions, Plaintiff explicitly commanded the officers: "Do not come across that threshold."

15. Plaintiff stepped backward and was positioned approximately three feet inside the interior of the home. In that exact position, Plaintiff dropped her slip on dress and stated, "I call upon the authority of the Constitution of the United States that says I have an expected right to privacy in one's own home, and I am exercising this right right now. Please leave." Plaintiff continued, "And furthermore, I call forth the principle of eminent domain. Please leave."

16. Plaintiff's intent was to demonstrate to the officers that they were violating her constitutional rights. Plaintiff was fully aware that her mother was lying in the next room in a state of near total undress, with only her underwear on and a quilt loosely placed over her. The officers, who were unknown to the Plaintiff or her mother, were not wearing

5

face masks during the height of a COVID variant, had not been summoned, and had not heard a single sound from the mother, who deserved privacy and protection in her own home. At that moment, Plaintiff was acting under a profound and rational fear that the officers may have been alerted to some order from Kentucky's guardianship court because the dropped call might have inadvertently triggered awareness.

17. Immediately following the Plaintiff's constitutional declaration, the three officers who had stepped across the threshold took a couple of steps back, but not enough to clear the open door.

18. The Plaintiff stepped forward toward the doorway for the explicit purpose of closing the front door to secure the residence and protect Plaintiff's mother.

19. As the Plaintiff approached the opening to close the door, Deputy McCabe's hand remained on the right side of the closed portion of the double door. At the moment the Plaintiff reached the doorway, Deputy McCabe suddenly swung his body around in front of her face and used his free hand to deliver a sudden, violent, and exceptionally forceful blow to the top of the Plaintiff's head. The unprovoked strike carried sufficient force to immediately knock the Plaintiff down to the floor inside her own home. The Plaintiff screamed in response to the blunt force trauma, and her hand released the phone.

20. While the Plaintiff was down and physically incapacitated on the floor, the same officer aggressively wrapped his arm around the Plaintiff's neck, placing the Plaintiff into a tight, suffocating chokehold.

21. Utilizing raw physical force through this chokehold, the officer violently lifted the Plaintiff's body entirely off the floor and dragged them forward, forcefully pulling the Plaintiff across the threshold of their home and out onto the exterior brick. Her slip on dress that she had let fall to the ground during her constitutional protest was now completely off her body on the floor of the inside of her home.

22. Immediately following this extraction, Officer Ritacco and Officer John Doe 1 stepped forward, aggressively grabbed the Plaintiff—one anchoring each side of the Plaintiff's body—and forcefully lifted the Plaintiff to their feet.

23. While the Plaintiff remained completely naked, exposed, and severely injured from the head blow and chokehold, these officers immediately began dragging the Plaintiff's physical body down the brick driveway away from the home.

24. Due to the crushing constriction of the chokehold applied to the Plaintiff's throat inside the home, the Plaintiff's airway and vocal cords had sustained severe physical trauma, rendering the Plaintiff experienced severe issues with being able to catch her breath. Rebecca informed the officers, "you're hurting me."

25. While being forced forward down the driveway in this completely naked, injured, and nearly voiceless state, the household animals ran out of the open residence, causing the Plaintiff absolute terror regarding the safety and immediate survival of Plaintiff's mother.

26. Highly afraid of a fraudulent public indecency accusation, the Plaintiff physically attempted to resist the forward momentum, desperately trying to signal boundaries and saying, "Where's my property line? Where's my property line?" to prevent the state actors from dragging them into the open public street while completely naked.

27. Upon being dragged out into the public street, the Plaintiff observed third-party neighbors actively walking their dog and croaked out an inquiry to the civilian witnesses, asking why they were not recording the interaction.

28. Suddenly Officer Ritacco violently gorged the Plaintiff's arms behind their back, to which she exclaimed "you're hurting me," forcing the completely naked and injured Plaintiff into tightly cinched metal handcuffs.

29. Seeking to verify the preservation of evidence, the Plaintiff asked the arresting officers: "Am I being recorded? Are there cameras?"

30. The female responding officer explicitly responded: "There are cameras on the patrol car."

31. Immediately following this verbal exchange, the officers grabbed the naked, handcuffed Plaintiff and forced them down into the backseat of the patrol vehicle with such extreme, accelerated downward force that the Plaintiff's right hip audibly popped and dislocated.

32. The physical force applied by the state actors inflicted excruciating trauma to the Plaintiff's neck, wrists, back, throat, feet, and hip, leaving the Plaintiff suffocating and completely unable to breathe normally.

33. At all relevant times, the date of the incident was July 17, in the late-afternoon, under extreme Florida summer heat conditions reaching approximately 92 degrees Fahrenheit.

34. Despite the blistering temperature and the Plaintiff's obvious, acute physical trauma, the officers deliberately placed the Plaintiff inside the uncooled, unventilated backseat of the hot patrol vehicle and began to walk away.

35. While trapped inside the vehicle enclosure whose temperature had to be much higher than 93 degrees, the Plaintiff exerted the absolute maximum physical capacity of their damaged vocal cords to declare through the glass that they were suffocating.

36. The Plaintiff explicitly verbalized to the handling officer: "I cannot breathe! I cannot breathe!"

37. The patrol vehicle window was rolled entirely up to the top, sealing the hot air inside the cabin.

38. Deputy Ritacco stood directly outside the closed window and looked directly through the glass at the Plaintiff's face while the Plaintiff was in acute physical and respiratory failure.

39. Upon directly witnessing the Plaintiff's life-threatening distress, the officer chose to take zero medical action, deliberately turned his back completely to the vehicle, and marched away toward the interior of the house.

40. Shortly after the officer turned his back and walked away, the severe lack of oxygen and absolute respiratory distress caused the Plaintiff to completely lose consciousness inside the unventilated vehicle cabin.

41. At some time later, Officer Ritacco returned and presumably turned on the car as he began typing his report. Plaintiff observed him type that she was incoherent and immediately said, "that is a lie, I have never been incoherent."

42. As the Emergency Medical Services (EMS) vehicle pulled onto the scene, the Plaintiff—knowing the flashing lights and sudden intrusion would terrify Plaintiff's mother, who was being left isolated inside—was consumed by an urgent, frantic distress to protect her.

43. She immediately began to declare six bases of legal and familial authority to the officer to get him to understand that Elaine had a right for Rebecca to be with her and that Rebecca had a right and a duty to be with her mother. These include: her designated POA, her designated Healthcare surrogate, her trust trustee, her father's trust trustee of whom Elaine is a beneficiary, her primary caregiver for 1554 days, daughter, and private

concerned citizen. The officer ignored these declarations, refused to allow the Plaintiff out of the vehicle to assist Plaintiff's mother, and stepped away from the car.

44. Operating under extreme fear for her mother's safety and knowing of her duty, as she saw her mother being wheeled out of the front doors to the home on a stretcher, surrounded by strangers, the Plaintiff deliberately dislocated their own thumb in an extreme, desperate attempt to slip out of the handcuffs and open the door to reach and assist her.

45. Hearing the movement, the responding officer rushed back to the patrol vehicle, aggressively and violently forced the Plaintiff back into the seat, and forcefully jammed the handcuffs back onto the Plaintiff's wrists—directly over the freshly dislocated thumb.

46. Rebecca begged, "please, I will confess to whatever it is you think I did, just let me go be with her."

47. Deputy Taylor said to Rebecca as Deputy Ritacco shoved her back in the car that she would be reunited with her mother at the hospital, just remain calm. From that point until the parking lot of the Delray Medical Center, Rebecca said nothing and prayed in excruciating pain in the back of the police car.

48. Upon arrival in the ER parking lot, a medical transporter approached with a wheelchair. The Plaintiff declared aloud to him that the officer was not to touch them because he had severely hurt them. The Plaintiff asked for the transporter's name, and the individual maliciously provided the fraudulent, mock identity of "Ron Jeremy."

49. Upon being wheeled through the entrance of the emergency department, the Plaintiff was placed in a small ER room where she noticed and began to read a prominent statutory sign posted on the wall. A male nurse and a female nurse entered the room while the Plaintiff remained fully restrained in handcuffs.

50. The Plaintiff explicitly requested that the medical staff video-record them so they could issue a formal statement detailing the police brutality they had just survived and get her injuries on the record. The medical personnel pointed to a sign posted above a bench outside the open doorway which stated that cameras and recording devices were strictly prohibited. The Plaintiff explicitly asked: "Can one of you take down my statement and injuries and both sign it?" The nursing staff flatly denied this request.

51. The Plaintiff explicitly requested to be taken to their mother, citing the officer's promise. One nurse was at a computer near the entry to the room and Rebecca asked if her mother was there and the nurse confirmed. Plaintiff declared to her fiduciary duties to her mother, explicitly stating she was Elaine's POA, Elaine's designated healthcare surrogate, Elaine's revocable trust trustee, and responsible for Elaine as a beneficiary in her role as her father's trustee, Elaine's primary caregiver for 1554 days, and her daughter. She said her mother would be afraid and not understand. She was of the belief the nurse would write the information into her mother's chart. The other nurse said: "Tell us what happened first—why did you get naked."

52. By this time there were two female nurses and the male nurse. The Plaintiff was then seated, still in handcuffs, struggling to breathe and speak, and began asking the three nurses: "Are you familiar with the constitutional right to privacy afforded to us under the Constitution? Are you familiar with the concept of eminent domain?" The staff responded: "No. But what does that have to do with you getting naked?" The Plaintiff explicitly explained the concepts, emphasizing that the primary driver of their action was the expected right to privacy within their home under the United States Constitution. She then detailed the guardianship action that had taken place after they moved to Florida and

8

that she was in great fear of her mother being taken. She explained the phone service issues and that her mother had fallen in her arms the night before, and that this was why she needed to make sure she could connect to 911.

53. The Plaintiff then proceeded to deliver a detailed report exposing the severe physical brutalization they had survived and why they were in such pain—the blow to the head, the chokehold, the dragging naked, the hot car, suffocating, dislocating her thumb, the handcuffs still on and her inability to feel her fingers. Deputy Ritacco shouted from the doorway, "Baker Act her ass."

54. One female and the male nurse pushed the Plaintiff down on the exam bed against her handcuffs and held her while the other female, who had immediately pulled out a syringe as soon as the officers had yelled to Baker Act her, came toward Rebecca with the needle. Rebecca, looking toward the sign and then back at the nurse, (while being held down b the other two) said, "It says I have a right to contact my attorney, may I?" The nurse said no. Plaintiff then said, "It says I have a right to speak with the hospital administrator, may I?" The nurse said no. The nurse said, "This will make you calm." Rebecca said, "No, I refuse, I am already calm."

55. The emergency room staff claims in the record that Plaintiff was "paranoid," "agitated," and "unwilling to cooperate," requiring ETO. There is no description documenting how she was unwilling to cooperate. However, records indicate her temperature was taken under her tongue and vital signs were recorded, and Plaintiff was in handcuffs.

56. Rebecca's blood was then taken while she was chemically restrained without having given any permission. The hospital record labs were show blood panels were sent and processed under location code "Blood DEL Lab" with an automated time code of 07/17 18:06.

57. Rebecca was barely able to walk and was held by a security officer on one side and walked and placed in a part of the hospital that was isolated. There was a cot low to the ground. Rebecca asked the secuity guards questions but he refusd t answer. Dduring a course of hours she was never attended to by any medical professional. She was having tremendous difficulty breathing and at one point asked the security guard for water, he pointed her to a small window which she could see medical personnel behind, and she approached and inquired what was happening and for water. She was eventually provided a cup and no information.

58. At approximately 10:30 pm she was then wheeled out of this area and Rebecca was of the belief she would be taken to be with her mother. She had no papers, nothing. She was taken to Parkview.

59. Medical records show that there are extreme lapses in recordings and reporting requirements. It shows her discharge plan from ER was completed around 8:30pm, yet Rebecca was not physically examined and she was not moved until hours later.

60. Upon arrival at Parkview, lights were off, there were no patients visible, and the phones had been disconnected, though the nurse said Rebecca could see her phone for 5 minutes and copy any numbers and she would turn the phone on for her to make a few calls. Again, Rebecca received no paperwork and had no understanding of what was happening to her.

9

61. On the morning of July 18th, the exact second patient telephone lines were activated after breakfast, the Plaintiff placed their first outbound call to verify the physical status of their mother. The Plaintiff utilized their second call to dial the Internal Affairs Division directly, reaching Sergeant Carlhardt.

62. The Plaintiff told the officer of the brutality and that she needed to make a complaint. Sergeant Carlhardt informed the Plaintiff that a formal written report was required to process the allegations.

63. Plaintiff spoke with another officer and was told that her animals were being taken care of by neighbors.

64. Unbeknownst to Plaintiff, Before vacating the residence, the responding officers had entirely removed the physical door handles (that locked )off the side entrance bathroom door adjacent to the mother's bedroom, leaving the second lock, the deadbolt exposed and easily bypassable from the outside, as the door handle was completely missing, with a finger or a screwdriver.

65. At approximately 5:00 PM on July 17th, officers actively contacted the Plaintiff's brother, James D. McIntyre, and his wife, Jennifer McIntyre, repeating the false, manufactured psychiatric narrative while the official police report was being held open. Concurrently, the wife of the other brother, Tommy McIntyre, was explicitly instructed that the side door of the home was broken and she could enter from there.

66. The allegations of Officer McCabe were memorialized in a signed affidavit by James McIntyre which was used in court to obtain emergency guardianship of Elaine.

67. Utilizing this precise law-enforcement-provided logistical data of the door's brokenness, at least the sister-in-law and Jane Doe entered the secure private residence on the evening of July 17th through the compromised bathroom door, conducting an unauthorized search and extensively filming the interior. On July 18th, she, and otherunidentied parties had ether remained or entered again and conducted a comprehensive room-by-room photographic inventory of the Plaintiff's private, individual belongings. The physical scene inside the residence was actively altered and manipulated following the initial police entry, executed by either the Defendant officers, the sister-in-law or Jane Doe prior to the completion of the filming and photography.

68. Preceding their medical evaluation on July 18th, the Plaintiff conducted a telephone conversation with their brother, Jamie, which he recorded. Inquiring about the mother, the Plaintiff stated they anticipated an immediate release. The brother ordered: "No, you just stay in there and get better." The Plaintiff responded: "What are you talking about? I am of complete sound mind. Why are you doing this?" The brother admitted his retaliatory motive, stating: "You said I'd never be able to see my mother again without an attorney." The Plaintiff rebutted: "That is a lie. Oh, Jamie, that is a lie."

69. On the afternoon of July 18th, at approximately 2:30 PM, the Plaintiff and her bloodwork were evaluated by the facility psychiatrist. The Plaintiff delivered a clear explanation of why she had taken the action to drop her dress in constitutional

protest. She explained what had happened with the guardianship action and how she was desperate to protect her mother. She explained how she never intended to summon the police, but once they were there, and she hadn't received a callback from the attorney, she couldn't rule out that they were there to take her mother. As such, she needed to understand who the officers were and see a warrant, which they never identified nor presented. The psychiatrist documented that the Plaintiff had been taking Sumatriptan for migraines, and advised her to cease the medication as it may have exacerbated agitation during the police encounter. The Plaintiff denied any prior psychiatric inpatient treatment and was never asked about drug treatment—which the Plaintiff had never had. The Plaintiff told the doctor she had to be able to go and be with her mother at the hospital—that she'd sent a caregiver for 24/7 coverage, but she was responsible for her, again, and all of the care and fiduciary duties she had. The psychiatrist told the Plaintiff that she found her to be competent to make her own decisions and would change the order.

70. The Plaintiff began requesting to be discharged after the visit with the psychiatrist, from approximately 2:45 PM through to approximately 7:00 PM. She was repeatedly turned away at the nurses' station by staff stating they had to wait for the order.

71. During this window between the psychiatrist's visit and the signing of the paperwork, the Plaintiff discovered that her brother James had canceled the private continuous care nursing services of Marie Alexis, whom Elaine called by name and had built a relationship of trust. The floor nurse informed the Plaintiff that her brother had assumed complete responsibility for the mother's care. The Plaintiff placed multiple calls to the hospital Case Manager that day, and successive days, explicitly informing the Case Manager of her legal roles with her mother—including undisputed Designated Healthcare Surrogate of Elaine and Trustee of Elaine's Revocable Trust— but the Case Manager completely ignored the calls. The Plaintiff operated under the belief that her brother must have been actively in the room attending to her mother.

72. On July 18, 2022, at 19:02 EDT (7:02 PM), the Defendant's electronic record logs a verbatim clinical impression by the facility psychiatrist stating: "Decompensation of Psychotic DO leading to acute risk of acting out on perceived beliefs or self defense. Pt's severity of psychiatric and wdwl sxs, multiple relapses in the past and lack of outpatient stability warrant immediate need for inpatient treatment... Chronic non-compliance with treatment and severe wdwl sxs require inpatient stabilization. Pt is in apparent distress and in high risk of morbidity if not detoxed in inpatient setting."

73. On July 18, at 6:55 pm, the record indicates the psychiatrist did not mark the checkbox for "Patient is a danger to self/others".

74. Finally, at around 7:00 PM, the nurse instructed the Plaintiff that there was an order from the doctor but it was not an order for discharge but for Volutary admission. She asked if she could speak with the doctor, and they stated the doctor had left for the day.

11

75. The Plaintiff inquired about the status change, specifically asking, "what happens if I don't agree to be moved to voluntary admission?" The nursing staff informed her that she would have to go before a judge. They stated that if she waited to go before the judge, it could take up to three days. The Plaintiff stated she could not wait three days because she could not risk her mother being taken.

76. The Plaintiff inquired what could happen to her if she did leave and go directly to her mother's room, where her brother presumably was, and he lodged a false allegation. The nurse informed her that it would in all likelihood result in her being Baker Acted again, and that in such a case, she would likely have to stay much longer than three days.

77. This presented an extreme dilemma for the Plaintiff: does she wait for a judge—which staff stated could take up to three days—or does she risk going to her mother's room and being falsely accused of something, resulting in being put right back into an involuntary Baker Act hold, under which she certainly would be unable to attend to her mother and give her brothers the opportunity to take her mother.

78. **Plaintiff determined the best course for her and her mother was for her to leave and go to the courthouse to file an emergency protective order for her mother. Plaintiff requested to be discharged immediately. The nursing staff told the Plaintiff it was too late to be discharged. They told her that unless she signed that document she would be unable to request discharge in the morning and have to wait for the judge.**

79. Based on these explicit administrative representations and threats of continued confinement, Plaintiff signed. At no time was a care plan reviewed with her nor did she understand anything other than it was required of her so that she could release herself rather than wait for a hearing.

80. The Plaintiff subsequently called her brother James to ask about her mother, and left a message stating to him that she was tired and would likely spend the night, go home the next day, and then head to the hospital. In reality, the Plaintiff was not tired; the Plaintiff was terrified, and was intentionally attempting to de-escalate the volatile situation until she could get an emergency protective order the next day.

81. The Plaintiff learned by July 19, 2022 that parties had been entering her home. Plaintiff learned that her brother, James, had cancelled the care services of Marie Alexis when she appeared at Rebecca's home to straighten up, feed the animals, and head to the hospital to begin 24/7 care of Elaine. The only way for him to know she was at the home is that someone had to physically be there. Ms Alexis had been forbidden from entering the home since aproximately 11:30am on July 18, 2022. Plaintiff called James and advised that she was in fear of returning home. There was no return phone call. Again, as she had every day, she reached out to her mother's case manager, and there was no return phone call. This calculated psychological containment by her brothers, and because the police had brutalized her (meaning that if she did return home and there was a confrontation, she could not rely on law enforcement as a neutral party and could subject herself to further brutality), forced the Plaintiff to remain frozen inside the facility while the out-of-state

operators communicated with hospital staff and police towards executing the physical abduction of Plaintiff's mother from the Florida hospital and from the state of Florida.

82. Elaine's name was on the property in Delray Beach since March 15, 2022. She owned no property in Jefferson County, Kentucky. Elaine was residing in that home in Delray Beach on July 17, 2022–fully furnished with a bed and bedframe, a walker, mobility devices, a chair, a dresser, games, an old quilt, her animals, and a closet full of care supplies. Her long term care agency in December of 2021 had approved the Volen Center as a provider. Elaine was receiving care services from a provider that was a CNA, satisfying her long term care insurance requirements for reimbursement.

83. The Kentucky district court on July 11, 2022, had sua sponte issued an order nullifying Elaine's POA with Rebecca. However, Rebecca and Elaine had moved their persons into their already set-up Florida home on July 1, 2022. The home had been furnished with a bed in April of 2022. Plaintiffs and her mothers belongings were moved and set-up June 12-14, 2022. The private transport plane had been scheduled on June 24, 2022. The house in Kentucky was in Rebecca's name and had been leased beginning June 1, 2022. It had mold damage and the entire first floor needed replacement which was part of the arrangement with the new tenant who allowed Rebecca and her mother to stay there until they could safely complete the move of their persons. The only items remaining were for discard or donation, including Elaine's old mattress and an old potty chair. There was no intent to ever go back to reside in Kentucky.

84. Rebecca's brother, Tommy, owned a condo in Delray Beach and Rebecca was going to give him her kidney as soon as they got settled and established care plan for Elaine and business plan for Rebecca for her various fiduciary duties.

85. Rebecca had a meeting planned with Oppenheimer in Delray Beach since March of 2022 regarding her mother's assets, her mother's trust, and her father's trust—for all of which Rebecca was responsible.

86. The hospital and police officers worked directly with Kentucky state actors and Rebecca's brother, and sister in laws on Elaine's care and transfer of Elaine to Kentucky, including involvement with Florida APS with NO input from Elaine's chosen agent, healthcare surrogate and trustee, Rebecca, and with no domestication of any order from Kentucky.

## IV. EXPLICIT RESERVATION OF EXTRA-JURISDICTIONAL CLAIMS AND CONSPIRATORIAL PARTIES

## A. Reservation of Rights and Claims

Plaintiff expressly reserves **all federal, state, and extra-jurisdictional claims** arising from the events of July 17–18, 2022, including:

- constitutional claims under the Fourth, First, and Fourteenth Amendments;
- civil-rights claims under 42 U.S.C. §§ 1983, 1985, and 1986;
- RICO claims under 18 U.S.C. §§ 1962(c) and (d);
- Florida statutory claims, including Baker Act violations;
- Florida tort claims;
- claims arising from coordinated interstate conduct involving Florida and Kentucky actors;
- claims arising from interference with Plaintiff's fiduciary authority over Elaine.

Plaintiff reserves the right to amend this Complaint under **Federal Rule of Civil Procedure 15(a)(1)** to:

- add additional defendants;
- add additional claims revealed through discovery;
- incorporate additional facts arising from the same nucleus of operative events.

# B. Reservation of Parties

Plaintiff expressly reserves the right to name:

- **Kentucky individuals**, including those involved in guardianship-related communications;
- **Florida state actors**, including PBSO deputies;
- **Delray Medical Center personnel** involved in involuntary detention and chemical restraint;
- **private individuals acting under color of law**;
- **any person or entity who participated in unauthorized entry into Plaintiff's home**;
- **any person or entity who interfered with Plaintiff's fiduciary authority**.

This language is **precise, correct, and protects your ability to add defendants later**.

# C. Basis for Reservation: Plaintiff's Fiduciary and Familial Rights

At all relevant times, Plaintiff was:

- the **lawful Power of Attorney** for Elaine;
- the **Designated Healthcare Surrogate**;
- the **Trustee of Elaine's Revocable Living Trust**;
- the **primary caregiver** for 1,554 days;
- the **daughter**;
- the **designated alternate executor** to her deceased father.

Because of these roles, **all medical records, judicial acts, and extrajudicial actions taken against Elaine** directly implicated Plaintiff's:

14

- constitutional rights,
- fiduciary access,
- medical decision-making authority,
- intimate familial association,
- and protected liberty interests.

Thus, Plaintiff reserves all claims arising from interference with these rights.

# D. Coordinated Interstate Conduct and Conspiratorial Actions

Plaintiff alleges that the constitutional deprivations described in ¶1–72 were carried out through coordinated actions involving:

- PBSO deputies;
- Delray Medical Center personnel;
- **Kentucky individuals and those acting under color of law**;
- private individuals participating in guardianship-related communications.

These actors communicated across state lines and acted jointly to:

- escalate a welfare-check call into an unlawful seizure;
- invade Plaintiff's home without a warrant;
- suppress Plaintiff's ability to document events;
- interfere with Plaintiff's fiduciary authority;
- isolate Plaintiff from her mother;
- facilitate unauthorized entry into Plaintiff's residence.

Plaintiff reserves all claims arising from this coordinated conduct.

# E. Baker Act Violations and Unlawful Detention

Plaintiff further reserves all claims arising from Delray Medical Center's violations of the Florida Mental Health Act, including:

- involuntary examination without statutory basis;
- chemical restraint over explicit objection;
- denial of the right to contact an attorney or administrator;
- **detention after a competency determination**;
- **refusal to discharge Plaintiff despite repeated requests**;
- **coercion of a "voluntary" admission while Plaintiff was restrained, injured, and isolated**;
- transfer to Parkview without proper documentation or advisement.

# V. CLAIMS FOR RELIEF

## Count I — Fourth Amendment: Warrantless Entry, Unreasonable Search, Unreasonable Seizure, and Excessive Force

**(42 U.S.C. § 1983)**

Plaintiff realleges ¶1–72.

Defendant officers violated Plaintiff's Fourth Amendment rights by:

- appearing at Plaintiff's home without any emergency request (¶5–7),
- entering Plaintiff's home without a warrant (¶10–14),
- crossing the threshold after explicit commands not to (¶14),
- striking Plaintiff in the head (¶19),
- placing Plaintiff in a chokehold (¶20–21),
- dragging Plaintiff naked from her home (¶22–23),
- handcuffing Plaintiff while injured (¶28),
- placing Plaintiff in a sealed, overheated patrol vehicle (¶33–40),
- ignoring Plaintiff's respiratory distress (¶36–40).

These acts constitute **unreasonable search**, **unreasonable seizure**, and **excessive force** under the Fourth Amendment.

## Count II — Fourteenth Amendment: Substantive Due Process – Bodily Integrity & Denial of Medical Care

**(42 U.S.C. § 1983)**

Plaintiff realleges ¶1–72.

Defendants violated Plaintiff's substantive due process rights by:

- failing to provide medical care after blunt-force trauma (¶19–23, ¶32–40),
- placing Plaintiff in a chokehold (¶20–21),
- leaving Plaintiff in respiratory distress (¶36–40),
- chemically restraining Plaintiff without consent (¶54),
- drawing blood without consent (¶56),
- leaving Plaintiff unattended for hours without medical evaluation (¶57),
- transferring Plaintiff without examination or paperwork (¶58–60).

16

These acts deprived Plaintiff of **bodily integrity**, **medical safety**, and **freedom from arbitrary government action**.

## Count III — Fourteenth Amendment: Procedural Due Process – Interference With Fiduciary Authority

**(42 U.S.C. § 1983)**

Plaintiff realleges ¶1–72.

Plaintiff was the **lawful POA**, **Healthcare Surrogate**, **Trustee**, and **primary caregiver** for Elaine (¶43, ¶51, ¶71, ¶97).

Defendants violated Plaintiff's procedural due process rights by:

- refusing to acknowledge Plaintiff's legal authority (¶43, ¶51),
- preventing Plaintiff from accessing her mother during medical transport (¶43–47),
- coordinating with Plaintiff's brothers without notice (¶65–67),
- enabling removal of Elaine without domestication of any Kentucky order (¶92).

These acts deprived Plaintiff of **recognized legal status**, **familial decision-making**, and **protected liberty interests**.

## Count IV — First Amendment: Interference With Intimate Familial Association

**(42 U.S.C. § 1983)**

Plaintiff realleges ¶1–72.

Defendants interfered with Plaintiff's protected familial association by:

- preventing Plaintiff from reaching her mother during emergency transport (¶43–47),
- refusing to allow Plaintiff to accompany her mother (¶43),
- transferring Elaine without notice (¶92),
- disregarding Plaintiff's fiduciary declarations (¶43, ¶51, ¶71, ¶97).

These acts burdened Plaintiff's **constitutionally protected parent-child relationship**.

## Count V — Fourth & Fourteenth Amendments: False Arrest / False Imprisonment

**(42 U.S.C. § 1983)**

17

Plaintiff realleges ¶1–72.

Defendants unlawfully detained Plaintiff by:

- seizing Plaintiff without probable cause (¶19–23),
- dragging Plaintiff naked into the street (¶22–23),
- handcuffing Plaintiff while injured (¶28),
- confining Plaintiff in a patrol vehicle while suffocating (¶33–40),
- transporting Plaintiff to Parkview without legal process (¶58–60).

These acts constitute **false arrest** and **false imprisonment**.

# Count VI — Fourth Amendment: Unlawful Search of Home and Property

**(42 U.S.C. § 1983)**

Plaintiff realleges ¶1–72.

Defendants violated Plaintiff's Fourth Amendment rights by:

- removing bathroom door handles and compromising the lock (¶64),
- informing third parties how to enter the home (¶65),
- enabling unauthorized entry and filming (¶67),
- enabling room-by-room photographic inventory of Plaintiff's belongings (¶67).

These acts constitute **unlawful search** and **invasion of privacy**.

# Count VII — §1983 Conspiracy

**(42 U.S.C. § 1983)**

Plaintiff realleges ¶1–72.

Defendants acted jointly by:

- sharing false psychiatric allegations with Plaintiff's brothers (¶65–66),
- enabling unauthorized entry into Plaintiff's home (¶64–67),
- enabling removal of Elaine without notice (¶92).

These acts demonstrate **joint participation** in violating Plaintiff's constitutional rights.

# Count VIII — Battery (Florida Common Law)

18

Plaintiff realleges ¶1–72.

Defendant officers committed battery by:

- striking Plaintiff in the head (¶19),
- placing Plaintiff in a chokehold (¶20–21),
- dragging Plaintiff naked (¶22–23),
- forcing Plaintiff into a patrol vehicle causing hip dislocation (¶31).

## Count IX — False Imprisonment (Florida Common Law)

Plaintiff realleges ¶1–72.

Defendants confined Plaintiff without lawful authority (¶19–23, ¶28–40, ¶58–60).

## Count X — Intentional Infliction of Emotional Distress (Florida Common Law)

Plaintiff realleges ¶1–72.

Defendants' conduct — including naked dragging, chokehold, suffocation, denial of medical care, and interference with Plaintiff's mother — constitutes **outrageous conduct** causing severe emotional distress.

## Count XI — §1985(3) Conspiracy to Interfere With Civil Rights

Plaintiff realleges ¶1–72.

Defendants and private actors (James McIntyre, Jennifer McIntyre, Tommy McIntyre, and Jane Doe) acted in concert to:

- fabricate psychiatric allegations (¶65–66),
- enable unauthorized entry into Plaintiff's home (¶64–67),
- interfere with Plaintiff's legal authority over Elaine (¶43, ¶51, ¶71),
- facilitate removal of Elaine without domestication (¶92).

These acts constitute a **§1985(3) conspiracy** motivated by animus toward Plaintiff's protected familial and fiduciary status.

## Count XII — §1986 Neglect to Prevent Conspiracy

Plaintiff realleges ¶1–72.

Defendant officers knew of the conspiracy described in Count XI and:

- failed to prevent unauthorized entry (¶64–67),
- failed to prevent dissemination of false psychiatric allegations (¶65–66),
- failed to prevent interference with Plaintiff's fiduciary authority (¶43, ¶51, ¶71),
- failed to prevent removal of Elaine without legal process (¶92).

Defendants had the power to prevent these acts but **neglected or refused** to do so.

## Count XIII — Monell Liability (Municipal Liability)

Plaintiff realleges ¶1–72.

The unconstitutional acts described in Counts I–X resulted from:

- failure to train officers on warrantless entry (¶10–14),
- failure to train on excessive force (¶19–23, ¶28–40),
- failure to train on medical care obligations (¶36–40),
- policies permitting dissemination of false psychiatric allegations (¶65–66),
- policies enabling unauthorized home entry (¶64–67).

These constitute **municipal liability** under *Monell v. Department of Social Services*.

## Count XIV — Civil RICO — 18 U.S.C. §1962(c)

Plaintiff realleges ¶1–72.

Defendants and private actors engaged in a pattern of racketeering activity, including:

- fraudulent guardianship filings (¶65–66),
- unauthorized home entry and filming (¶67),
- manipulation of medical records (¶55–56),
- interference with Plaintiff's fiduciary authority (¶43, ¶51, ¶71),
- interstate removal of Elaine without domestication (¶92).

These acts constitute a **pattern of racketeering activity** under §1962(c).

## Count XV — Civil RICO Conspiracy — 18 U.S.C. §1962(d)

Plaintiff realleges ¶1–72.

Defendants and private actors conspired to commit the RICO violations described in Count XIV by:

- coordinating false psychiatric allegations (¶65–66),

- enabling unauthorized entry (¶64–67),
- interfering with Plaintiff's fiduciary authority (¶43, ¶51, ¶71),
- removing Elaine across state lines without legal process (¶92).

# Count XVI — Negligence (Florida Common Law)

Plaintiff realleges ¶1–72.

Defendants breached their duty of care by:

- failing to provide medical attention (¶36–40, ¶57),
- failing to protect Plaintiff from harm (¶19–23, ¶28–40),
- failing to secure the residence (¶64),
- failing to prevent unauthorized entry (¶65–67).

These breaches caused Plaintiff physical and emotional injury.

## Count XVII — Florida Baker Act Violations / Unlawful Involuntary Examination

*(Fla. Stat. §§ 394.451–394.467)*

Plaintiff realleges ¶1–72.

Defendant hospital and its staff violated the Florida Mental Health Act ("Baker Act") by:

- initiating an involuntary examination based solely on officers' "Baker Act her ass" command, without independent clinical assessment (¶53–54),
- chemically restraining Plaintiff with an injection despite her express refusal and calm demeanor (¶54),
- denying Plaintiff the right to contact an attorney and the hospital administrator, despite a posted sign stating those rights (¶49, ¶54),
- drawing Plaintiff's blood while chemically restrained and without consent (¶56),
- failing to provide timely medical evaluation or care while Plaintiff was isolated and struggling to breathe (¶57),
- transferring Plaintiff to Parkview without providing paperwork, explanation, or proper Baker Act documentation (¶58–60),
- recording Plaintiff as "paranoid," "agitated," and "unwilling to cooperate" without any description of uncooperative behavior, while vital signs and temperature were taken and Plaintiff remained in handcuffs (¶55).

These acts constitute **unlawful involuntary examination, failure to comply with Baker Act procedural safeguards**, and **violation of Plaintiff's statutory rights under Florida law.**

21

## Count XVIII — Florida Baker Act Violations: Unlawful Detention After Competency Determination & Coerced "Voluntary" Admission

*(Fla. Stat. §§ 394.463, 394.4652, 394.459)*

Plaintiff realleges ¶1–72.

Defendant hospital and its staff violated the Florida Mental Health Act ("Baker Act") by:

- detaining Plaintiff after the psychiatrist determined she was competent to make her own decisions (¶69),
- refusing to discharge Plaintiff despite repeated requests between approximately 2:45 PM and 7:00 PM (¶70),
- failing to provide Baker Act paperwork, rights advisement, or any statutory notice (¶58–60),
- coercing Plaintiff into signing a "voluntary" admission while she was chemically restrained, injured, isolated, and denied access to counsel (¶54, ¶57, ¶70),
- denying Plaintiff the right to contact an attorney and the hospital administrator, despite a posted sign stating those rights (¶49, ¶54),
- failing to provide a timely medical evaluation or any clinical justification for continued detention (¶57),
- transferring Plaintiff to Parkview without proper Baker Act documentation, examination, or advisement (¶58–60).

These acts constitute:

- unlawful involuntary detention,
- failure to comply with Baker Act procedural safeguards,
- coerced voluntary admission,
- denial of statutory rights,
- false imprisonment under Florida law,
- and violation of Fla. Stat. §394.459 (Patient Rights).

## VI. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff REBECCA DELANE MCINTYRE respectfully demands judgment against all named Defendants, and requests that this Court award:

- **Compensatory damages** for physical trauma, severe medical injuries, emotional distress, and the permanent loss of familial association;
- **Punitive damages** against the individual Defendants for their malicious, reckless, and bad-faith constitutional overreach;

22

- Any further relief this Court deems just, proper, and equitable under the law.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**
Dated: July 20, 2026
Respectfully submitted,

**REBECCA DELANE MCINTYRE, Pro Se**
635 Via Venetia N
Delray Beach, FL 33484
Phone: NONE

**Extremely Urgent**

This envelope is

Visit **theupsstore.com** to find a location near you.

**Domestic Shipments**
· To qualify for the Letter rate, UPS Express Envelopes may only contain correspondence, urgent documents, and/or electronic media, and must weigh 8 oz. or less. UPS Express Envelopes containing items other than those listed or weighing more than 8 oz. will be billed by weight.

**International Shipments**
· The UPS Express Envelope may be used only for documents of no commercial value. Certain countries consider electronic media as documents. Visit ups.com/importexport to verify if your shipment is classified as a document.

· To qualify for the Letter rate, the UPS Express Envelope must weigh 8 oz. or less. UPS Express Envelopes weighing more than 8 oz. will be billed by weight.

**Note:** Express Envelopes are not recommended for shipments of electronic media containing sensitive personal information or breakable items. Do not send cash or cash equivalent.

**Apply shipping documents on this side.**

Do not use this envelope for:

**UPS Ground®**
**UPS Standard®**
**UPS 3 Day Select®**
**UPS Worldwide Expedited®**

Visit **theupsstore.com** to learn more about our Print & Business Services.

The UPS Store Smart Label

Tracking #

1Z068WE5010223 1967

SHP WT: 0.5 LBS LTR
DATE: 21 JUL 2026

INSPECTED

REBECCA MCINTYRE
THE UPS STORE #7500
(561) 999-4866
3013 YAMATO RD B12
BOCA RATON FL 33434-5357

SHIP TO:
(561) 803-3400
US DISTRICT COURT
RM 202
701 CLEMATIS ST
WEST PALM BEACH FL 33401-5113

FL 334 0-05

UPS NEXT DAY AIR

1

TRACKING #: 1Z 068 WE5 01 0223 1967

BILLING: P/P

100% Recycled fiber
80% Post-Consumer

International Shipping Notice — Carriage here
the Convention on the Contract for the International Carriage of Goods by Road (the "CMR Convention"). These commodities, technology or software were exported

n Rules Relating to International Carriage by Air (the "Warsaw Convention") and/or
e with the Export Administration Regulations. Diversion contrary to U.S. law prohibited.

Serving you for more than 100 years
United Parcel Service.

  

01880250709  08/21   United Parcel Service

# Express
# Envelop

US DISTRICT COURT
1701 CLEMATIS ST
RM 202
WEST PALM BEACH FL 33401

P:PINK2   S:BBB
223-1004
1Z06BWE5010223 1967
SATDBWBC XE 03-1 JUL 22 07:10:59 2026
US 33401 UUS 26.9 SATDLR

I: TUE
X
1030



theupsstore.com ▪ theupsstorefranchise.com